IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**MILTON ROBINSON; and**                                                              **PLAINTIFFS**
**PATRICIA ROBINSON**

**V.**                                                                  **NO. 4:15-CV-00123-DMB-JMV**

**RAY MORRIS; MICHAEL MELTON;**
**DWAYNE SMITH; CHRISTOPHER SURF;**
**JOE WALKER; and JOHN DOES 1 AND 2**
**IN THEIR INDIVIDUAL CAPACITIES**                                        **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This civil rights action brought by Milton and Patricia Robinson against various law enforcement officials is before the Court on: (1) the motion to dismiss of Dwayne Smith, Christopher Surf, and Joe Walker, Doc. #25; (2) the motion to dismiss of Ray Morris, Doc. #29; and (3) the motion to substitute of Smith, Surf, and Walker, Doc. #37.

**I**
**Procedural History**

On September 9, 2015, Milton and Patricia Robinson filed a complaint against Smith, Surf, Morris, Walker, Michael Melton and "John Does 1 and 2, in their individual capacities." Doc. #1. The complaint asserted claims under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), arising from the execution of a search warrant at an incorrect address. *Id*. at 1. On October 9, 2015, the Robinsons filed an amended complaint, as of right, based on the same general factual allegations. Doc. #6. The amended complaint contains a single "claims" section, which alleges "unreasonable search and seizure and use of unnecessary and excessive force under the Fourth and Fourteenth Amendments of the United States Constitution." *Id*. at 4.

Morris and Melton each filed an answer to the amended complaint on, respectively, October 15, 2015, and October 19, 2015. Doc. #10; Doc. #12. On January 26, 2016, Smith, Surf, and Walker filed a motion to dismiss ("SSW Motion"), which they supported with numerous exhibits. Doc. #25. Three days later, on January 29, 2016, Morris filed a motion to dismiss. Doc. #29.

On February 10, 2016, the Robinsons filed a "Motion for Voluntary Dismissal of Certain Defendants," seeking to dismiss Morris, Melton, Smith, and John Does 1 and 2. Doc. #33.

On March 7, 2016, Smith, Surf, and Walker, filed a motion to substitute "Exhibit 1" of the SSW Motion. Doc. #37. The following day, the Robinsons responded in opposition to the SSW Motion. Doc. #38. Like the SSW Motion, the Robinsons' response includes numerous exhibits supporting its arguments. *See* Doc. #38-1 to 38-9. Smith, Surf, and Walker timely replied. Doc. #41.

On March 16, 2016, this Court entered an order granting the Robinsons' motion for voluntary dismissal and dismissing Morris, Melton, Smith, and the fictitious defendants. Doc. #42.

## II
## Procedural Matters

Before turning to the merits of the Robinsons' claims, the Court must first address some procedural issues raised by the filings to date.

### A. Mooted Motions

Since the filing of Morris' motion to dismiss and the SSW Motion, this Court has dismissed both Morris and Smith. Accordingly, Morris' motion to dismiss will be denied as moot. Furthermore, to the extent the SSW Motion seeks dismissal of the claims against Smith, it will be denied in part as moot as to Smith but will be addressed below as to Surf and Walker.

2

**B. Motion to Substitute**

The motion to substitute seeks to substitute the search warrant that is Exhibit 1 to the SSW Motion with a different search warrant. Doc. #37. The motion represents that the search warrant originally attached to the SSW Motion was erroneously included and that the search warrant to be substituted (which is attached to the motion to substitute) is the warrant relevant to the Robinsons' claims. *Id.* The motion further represents that the requested relief is unopposed.

Upon consideration, the motion to substitute is granted in part as to Surf and Walker, and denied in part as moot as to Smith due to his dismissal by the Court. The search warrant attached to the motion to substitute is substituted for Exhibit 1 to the SSW Motion.

**C. Conversion of SSW Motion**

In the SSW Motion, Surf and Walker seek dismissal under Federal Rule of Civil Procedure 12(b)(6). As a general matter, where a defendant files a 12(b)(6) motion and "submit[s] matters outside the pleadings without such evidence being excluded by the Court [within ten days]," the proper course is to treat the 12(b)(6) motion as a motion for summary judgment. *McNair v. Mississippi*, 43 F.Supp.3d 679, 682 (N.D. Miss. 2014) (citing *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1284 (5th Cir. 1990)). With the SSW Motion, Surf and Walker submitted matters outside the pleadings, and more than ten days have since passed without such evidence being excluded by this Court. Under these circumstances, the Court will treat the SSW Motion as a motion for summary judgment. *McNair*, 43 F.Supp.3d at 682.

**III
Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals*

*P'ship,* 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Id*. at 411–12 (internal quotation marks and citation omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412.

"If … the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 191–92 (5th Cir. 2011) (citation and internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

## IV
## Factual Background

### A. The Properties

Two residential properties, both located in Rosedale, Mississippi, are relevant to this action.

The home located at 406 Minnie Ervin Road, pictured in Image 1,[1] was involved in a Drug Enforcement Administration ("DEA") investigation during the time period relevant to this suit. Doc. #25-3 at ¶ 10.

*Image 1*



The home located at 509 Danna Street, pictured in Image 2,[2] was owned by the Robinsons during the time period relevant to this suit. Doc. #38-8 at ¶ 1. The Danna Street home has the number "509" displayed above its front door. *Id.* at ¶ 14; Doc. #38-5.

---

[1] Image 1 is a photograph filed as Exhibit 2 to the Robinsons' response. *See* Doc. #38-2. It was taken by Milton Robinson on August 26, 2014. Doc. #38-8 at ¶¶ 10–14.

[2] The photograph that is Image 2 was filed as Exhibit 1 to the Robinsons' response. *See* Doc. #38-1. It was taken by Milton Robinson on August 26, 2014. Doc. #38-8 at ¶¶ 10–14.

*Image 2*



## B. DEA Investigation and Search Warrant

During the summer of 2015, DEA agents, along with the Mississippi Bureau of Narcotics and the Greenville Police Department Drug Unit, were conducting a joint investigation of a drug trafficking organization involving the transportation of cocaine and marijuana from Texas to North Mississippi for sale. Doc. #25-3 at ¶¶ 4–5. Of relevance here, three of the officers involved in the investigation were Surf, a sergeant with the Greenville Police Department assigned as a Task Force Officer to the DEA, Doc. #25-2 at ¶¶ 1–2; Walker, a special agent with the DEA assigned to the DEA's Oxford, Mississippi, office, Doc. #25-3 at ¶¶ 2–3; and Smith, then the Resident Agent in Charge of the DEA's Oxford office, Doc. #25-4 at ¶ 2. Smith was the agent in charge of the investigation. *Id.* at ¶ 4.

As a part of the investigation, a Bolivar County state court judge issued a search warrant for:

> 406 Minnie Ervin Road ... located in Rosedale, Bolivar County, Mississippi. This residence is described as a brownish colored brick residence with a brownish colored roof with the front door of the residence facing south. To reach the residence from the intersection of MS 8 West and MS 1 North; turn north from MS 8 West onto MS 1 North. Travel approximately ¾ mile north on MS 1 North and turn east onto Shelby Street (just after passing Rosedale High School). Travel Shelby Street east to the stop sign at Shelby Street and Riverside Drive. Turn north onto Riverside Drive and travel north approximately ¼ mile to the intersection of Riverside Drive and the second entrance of Minnie Ervin Road. Turn left (east) onto Minnie Ervin and the residence will be the 4th residence on the north side of the street ....

Doc. #37-1.

### C. Travel to the Search Scene

On August 26, 2014, the target of the search warrant for the home at 406 Minnie Ervin Road purchased drugs from his supplier somewhere in Rosedale. Doc. #25-3 at ¶ 7. After the purchase was made, the target of the warrant eluded arrest and surveillance by law enforcement officers. *Id.* at ¶ 8. After learning the target was evading arrest, Smith ordered the immediate execution of the search warrant "[b]ecause ... there was a fear that the drug evidence would be destroyed before [the target] could be located." Doc. #25-4 at ¶ 9. Smith tasked Walker with leading the team on the execution of the 406 Minnie Ervin warrant.[3] *Id.* at ¶ 10.

Walker, who had only been by 406 Minnie Ervin Road once before, traveled to execute the warrant with Surf. Doc. #25-3 at ¶ 11–14. The officers traveled to the property "very early" in the morning. Doc. #25-2 at ¶ 10. Because there were no street signs and there was "minimal light," Walker, who was driving, turned one street early and, as a result, ended up driving down Danna Street rather than Minnie Ervin Road. Doc. #25-3 at ¶ 11.

---

[3] Other teams were tasked with the execution of different warrants. Doc. #25-4 at ¶ 10.

After turning down the street and identifying what he believed to be the correct house, but was actually 509 Danna Street, Walker asked Surf to confirm that the residence was in fact 406 Minnie Ervin Road. *Id*. at ¶ 13. Because the home, like the one at 406 Minnie Ervin, was a "one story red brick rambler" and because Surf "observed a car parked ... that closely resembled one that the target drove," Walker concluded he was at the correct home and ordered the execution of the search warrant. *Id*. at ¶¶ 14–15.

### D. The Search

At Walker's direction, members of Walker's team knocked on the door of the Danna Street home and announced, "police, search warrant," for approximately two to three minutes. Doc. #25-3 at ¶ 15. After receiving no response, the team forced the front door to the residence open and entered the house. *Id*. at ¶ 16. At the time of their entry, which was at about sunrise, the officers had firearms drawn. Doc. #38-8 at ¶ 2.

Surf entered the home and observed a middle aged man, later identified as Milton Robinson. Doc. #25-2 at ¶ 17. Surf ordered Milton to the floor and, after Milton complied, handcuffed him "for officer safety purposes." *Id*. Shortly after, Surf ordered Milton's wife, Patricia Robinson, to the floor and handcuffed her. *Id*. at ¶ 18; Doc. #38-8 at ¶ 1.

When Walker entered the home, he observed that Milton appeared older than the target, and that Patricia appeared younger than the target's mother, who was believed to reside at 406 Minnie Ervin Road. Doc. #25-3 at ¶ 18. Walker asked the Robinsons for their names and address. Doc. #38-8 at ¶ 6. Walker exited the residence, checked the house number, and discovered that the officers had searched the wrong home. Doc. #25-3 at ¶ 19. Walker re-entered the home, immediately un-cuffed the Robinsons, apologized to them, checked them for physical injuries, and asked whether they were otherwise in need of assistance. *Id*. at ¶¶ 21–24.

8

After learning of the error, Walker ceased all search activities. Doc. #25-3 at ¶ 24. The search, which lasted approximately ten minutes, resulted in a broken door and laptop (which had been accidentally knocked off the stand). *Id*. at ¶ 25. The Robinsons "expressed [to Walker] concern" about both these items.[4] *Id*.

### E. Repair of the Door

Shortly after the entry into the Robinsons' home, Walker informed Smith that the search warrant had been executed at the wrong location. Doc. #25-4 at ¶ 12. Smith "immediately" traveled to the Robinsons' home and "spent some time talking with the Robinsons and apologizing for the mistake." *Id*. at ¶¶ 13–14. Smith asked the Robinsons if they needed medical attention and they said they were fine. *Id*. at ¶ 15. However, the Robinsons informed Smith that they were in the final stages of closing a sale on their home and that the sale was scheduled to occur the following day. *Id*. at ¶¶ 18–19. Smith made arrangements to have the front door repaired with funds provided by Walker.[5] *Id*. at ¶¶ 16–17.

Workmen appeared at the Robinsons' home between 6:30 and 7:00 p.m. that evening. Doc. #38-8 at ¶ 15. At that time, an officer informed the Robinsons that, before beginning work, the Robinsons were required to sign some paperwork. *Id*. at ¶ 16. The Robinsons were "assured that the papers pertained only to getting the door fixed." *Id*. at ¶ 17. Because the closing on their home was scheduled to occur the next day, the Robinsons signed two documents provided by the officer. Doc. #38-8 at ¶¶ 1, 18.

---

[4] Although not identified at the time, the incident triggered Milton's post-traumatic stress disorder, which he suffers from as a result of his military service. Doc. #38-8 at ¶ 20. Both Milton and Patricia were "shaken and ... developed anxiety and problems sleeping." *Id*.

[5] Walker was later reimbursed by the DEA. Doc. #25-4 at ¶ 17.

9

The first document was a "Claim for Damage, Injury, or Death" form. Doc. #25-5. As a "Basis of Claim," the form lists "Damage to front Door during execution of Search warrant." *Id*. Claim amounts of zero for "Property Damage," "Personal Injury" and "Total" are reflected on the form. *Id*.

The second form, titled, "Voucher for Payment Under Federal Tort Claims Act," includes a description of claim as "Damage to front door." Doc. #25-6. The voucher also includes a section titled, "Acceptance By Claimants," which states:

> I (We) the claimant(s) and beneficiaries, do hereby accept the within-stated award, compromise, or settlement as final and conclusive on me (us), on my (our) heirs, executors, administrators or assigns, and agree that said acceptance constitutes a complete release by me (us), on my (our) heirs, executors, administrators or assigns of any and all claims, demands, rights, and causes of action of whatsoever kind and nature arising from, and by reason of any and all known and unknown, foreseen and unforeseen and bodily and personal injuries, damage to property and the consequences thereof, resulting, and to result, from the same subject matter that gave rise to the claim for which I (we) or my (our) heirs, executors, administrators, or assigns, and each of them, now have or may hereafter acquire against the United States and against the employee(s) of the Government whose act or omission gave rise to the claim by reason of the same subject matter, including any future claim for the wrongful death of me (us). I (We) further agree to reimburse, indemnify, and hold harmless the United States, its agents, servants and employees from any and all claims or causes of action, including wrongful deaths, that arise or may arise from the acts or omissions that gave rise to the claim by reasons of the same subject matter.

Doc. #25-6. Although the Robinsons signed the voucher, a number of sections of the form are empty, specifically: (1) a section for "Amount claimed;" (2) a section for "Amount of award, compromise, or settlement;" (3) a section for approval of the award by the "Head of Federal agency, or authorized designee;" and (4) a section for certification of the voucher by an "Authorized certifying officer." *Id*.

After signing the forms, the Robinsons' door was repaired and the computer was replaced. Doc. #38-8 at ¶ 19. The closing on the Robinsons' home took place as scheduled. Doc. #25-4 at ¶ 19.

# V
# Analysis

As explained above, the Robinsons claim that Surf and Walker violated their right to be free from warrantless searches and their right to be free from applications of excessive force.[6] Surf and Walker argue that dismissal of these claims is warranted because they are entitled to qualified immunity and because the Robinsons released their claims arising from the unlawful entry.

### A. Qualified Immunity

"Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lytle v. Bexar Cty.*, 560 F.3d 404, 409 (5th Cir. 2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014). Under the first prong, the Court "asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Id*. (internal quotation marks and alterations omitted). "The second

---

[6] Although it is less than clear, it appears that the Robinsons bring their claims for constitutional violations against Walker under *Bivens* and their claims against Surf under § 1983. Under *Bivens*, "the victim of a constitutional violation by a federal agent has a right to recover damages against the agent in federal court." *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1295 (5th Cir. 1994). In contrast, § 1983 authorizes a cause of action against a person acting under color of state, rather than federal, law. 42 U.S.C. § 1983. "[C]ourts have found that state officers who were deputized by federal agencies and who were acting in that capacity are subject to claims under *Bivens*," rather than § 1983. *Allen v. Travis*, No. 3:06-cv-1361, 2008 WL 4602734, at *3 n.2 (N.D. Tex. Oct. 10, 2008) (collecting cases). Here, Surf and Walker argue that Surf was deputized but offered no evidence on this point. Nevertheless, because the "constitutional torts authorized by [*Bivens* and § 1983] are coextensive," there is no need to distinguish between the claims here. *Izen v. Catalina*, 398 F.3d 363, 367 n.3 (5th Cir. 2005).

prong ... asks whether the right in question was 'clearly established' at the time of the violation.'" *Id*. at 1866.

### 1. Warrantless search

As an initial matter, the Court must decide whether the conduct of either Surf or Walker amounted to a warrantless search and, if so, whether the right was clearly established at the time of the violation.

#### a. *Constitutional violation*

"The Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (quoting U.S. Const. amend IV) (internal alterations omitted). Generally, "[a] warrantless, unconsented entry into a person's home is presumptively unreasonable under the Fourth Amendment unless supported by probable cause and conducted pursuant to exigent circumstances." *United States v. Newman*, 472 F.3d 233, 236 (5th Cir. 2006). However, "[i]n *Maryland v. Garrison*, 480 U.S. 79, 88 (1987), the Supreme Court held that police officers do not necessarily violate the Fourth Amendment when they mistakenly execute a search warrant on the wrong address." *Simmons v. City of Paris*, 378 F.3d 476, 479 (5th Cir. 2004) (internal citations omitted). Where an officer executes a search warrant on a wrong address, a court must ask whether the wrongful execution "was objectively understandable and reasonable." *Garrison*, 480 U.S. at 88.[7] Even if an officer acted reasonably

---

[7] *See United States v. Patterson*, 278 F.3d 315, 318 (4th Cir. 2002) ("[T]he agents' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched, and thus their search did not violate the Fourth Amendment.") (internal quotation marks, citations, and alterations omitted); *Powell v. Nunley*, 682 F.Supp.2d 1260, 1267 (W.D. Okla. 2010) ("[I]n determining whether the officers' entry into the Powell residence violated their Fourth Amendment rights, the question becomes whether the officers' actions, though mistaken, were nonetheless objectively reasonable so as to make the entry the sort of 'honest mistake' to which *Garrison* alluded."); *Dawkins v. Graham*, 50 F.3d 532, 534 (8th Cir. 1995) ("[U]nder *Garrison*, the execution of a valid warrant on the

when executing the warrant, "when law enforcement officers are executing a search warrant and discover that they have entered the wrong residence, they should immediately terminate their search." *Simmons*, 378 F.3d at 479–80.

Here, the Robinsons argue objective unreasonableness based on the initial entry, not on any unlawful continuation of the search. *See* Doc. #39 at 14. Specifically, the Robinsons contend:

> Neither officer was very familiar with the area. Thus it was objectively unreasonable for them to fail to check the house number. It was objectively unreasonable to decide to enter based on the vague similarities between the two houses and the two cars, and to ignore the numerous dissimilarities.

Doc. #39 at 14.

In assessing reasonableness, the Court relies primarily on *Rogers v. Hopper*, a case with very similar facts to those presented here. 271 F. App'x 431, 434–35 (5th Cir. 2008). In *Rogers*, various officers were involved in an undercover investigation into drug sales at a target home. *Id*. at 431–32. As a result of the investigation, the officers obtained a search warrant for the address which, due to security concerns, the officers opted to execute at night. *Id*. at 432. Pursuant to a warrant-execution plan, two officers would park a car in front of the target home as a signal to the searching officers. *Id*. One of the officers tasked with identifying the home "saw what he thought was [a] vehicle [previously parked in front of the target home and] relied on the location of this vehicle to cue him as to the proper house." *Id*. The officers parked in front of the home and, shortly after, realized they had parked in front of the wrong home. *Id*. Although they attempted to call off the search, the other officers entered the home and handcuffed the

---

wrong premises violates the Fourth Amendment if the officers should know the premises searched are not the premises described in the warrant, i.e., the officers' mistake is not objectively reasonable.").

plaintiffs. *Id*. The plaintiffs sued and the officers moved for summary judgment under qualified immunity. *Id*.

The district court in *Rogers* granted summary judgment in favor of the defendants, finding that the officers tasked with identifying the home acted reasonably. *Id*. On appeal, the plaintiffs argued:

> that unreasonableness is shown by these facts: (1) the Plaintiffs' home was brown or beige while the proper house was white with green trim; (2) Plaintiffs' house had a large tree in the front yard while the proper house did not; (3) Plaintiffs' house had a covered front porch while the proper house did not; and (4) both houses had marked house numbers. Plaintiffs also allege that the fact that [the officers] had been at the correct house at least twice before and that the address listed in the search warrant was accurate are facts that weigh against the grant of qualified immunity to the Defendants.

*Id*. at 433–34.

In concluding that the defendants acted reasonably,[8] the Fifth Circuit noted that the defendants:

> made an initial surveillance of the house shortly before the warrant was executed, though they increased the chance for mistake by approaching the house in the opposite direction than they would use later. The relevant houses were next door to each other. Despite differences in appearance, those differences were less noticeable at night. It is also true that because the search was to occur at night, the chance for a mistake was greater and the need for precautions proportionately were increased. Finally, a car that earlier had been thought to be in front of the

---

[8] Strangely, the Fifth Circuit in *Rogers* first held that "[t]he Plaintiffs unquestionably demonstrated the violation of a constitutional right. The Defendants did not have a warrant or any other constitutionally sufficient justification for entering the Plaintiffs' home." 271 F. App'x at 433. The Fifth Circuit then proceeded to inquire whether the defendants' actions were objectively unreasonable. *Id*. at 433–35. To the extent *Rogers* held that a Fourth Amendment violation is shown merely by unlawful entry, it is clearly inconsistent with *Garrison*, on which the *Rogers* court relied. This Court treats the *Rogers* discussion of objective reasonableness as a *Garrison* inquiry. To the extent *Rogers* represents a modification of the qualified immunity inquiry in wrongful search cases, the result in this case would not change because the Court finds that, under *Rogers*, Surf and Walker's actions were objectively reasonable. *See Hunt v. Tomplait*, 301 F. App'x 355, 359 (5th Cir. 2008) ("Although [warrantless] searches are presumptively unreasonable, law enforcement officers are generally granted qualified immunity if the evidence is undisputed that they merely made an honest mistake when entering the incorrect home. An honest mistake can only be clearly established if the officers' conduct is consistent with a reasonable effort to ascertain and identify the place to be searched.") (internal citations and quotation marks omitted).

> house to be searched was instead in front of the Plaintiffs' home when the search began.

*Id*. at 435. In reaching this conclusion, the Fifth Circuit distinguished the facts of *Rogers* from *Hartsfield v. Lemacks*, 50 F.3d 950 (11th Cir. 1995), in which the Eleventh Circuit found that the defendant officers had acted unreasonably where the leading officer "did not take any precautionary measures to ensure that he was leading the team to the right house" and "did nothing to avoid the mistaken execution" of the warrant. *Rogers*, 271 F. App'x at 434–35 (internal quotation marks omitted). The Fifth Circuit also noted "[a]dditional indications of the unreasonableness of the error [in *Hartsfield*:] that execution of the warrant was during daylight hours; the numbers on the homes were clearly marked; the homes were on different parts of the street; and the homes were separated by at least one house." *Id*.

Here, as in *Rogers*, officers with limited experience with a target home erroneously executed a search warrant during a time of day with minimal light based primarily on the presence of a car the officers believed to have a connection to the target home.[9] Furthermore, here, as in *Rogers*, the plaintiffs argue that the defendants acted unreasonably because the target home and the searched home had physical differences and had visible street numbers. In essence, the only differences between this case and *Rogers* are that: (1) weighing against reasonableness, the target home and searched home here were located on different streets, not next-door; and (2) weighing in favor of reasonableness, the officers in this case were under

---

[9] The Robinsons, arguing that the two cars were not similar, have submitted photographs of a tan four-door Chrysler 300 parked outside the target home and their own tan two-door Chevrolet Monte Carlo. *See* Doc. #38-8 at ¶ 12; Doc. #38-3; Doc. #38-4. Images of the cars, which were taken at different angles, do not reveal substantial differences between the two automobiles. Furthermore, there is no indication in the record that the Chrysler 300 is the car the target drove and, therefore, is the car on which Walker based his initial assessment.

orders to effectuate an "immediate" execution of the warrant to preserve evidence.[10] Under these circumstances, the Court must conclude that, under *Rogers*, Surf and Walker acted objectively reasonably and that, therefore, the officers did not violate the Fourth Amendment in searching the Robinsons' home.

### b. Clearly established

At the second stage of the qualified immunity inquiry, the Court must "assess whether the defendant's conduct was objectively reasonable in light of clearly established law." *Thompson v. Ushur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001). In making this determination, the Court must look beyond "general propositions," and evaluate "the specifics facts of a case ...." *Gonzalez v. Huerta*, 826 F.3d 854, 857–58 (5th Cir. 2016). Under this standard, "the question becomes whether there is either directly controlling authority establishing the illegality of such conduct or a consensus of cases of persuasive authority such that a reasonable officer could not have believed that *his actions* were lawful." *Id.* at 858 (emphasis in original, internal quotation marks and alterations omitted). Put differently, the Court must ask whether, in light of relevant authority, a reasonable police officer should have known that Walker and Surf's efforts in ascertaining the identity of the place to be searched were unreasonable, and therefore illegal.

Given the holding in *Rogers* regarding objective reasonableness, the Court cannot conclude that a reasonable officer observing similarities between a target home and another home, and the presence of a car similar to a target's car, would believe he was acting unlawfully in executing a warrant on the observed home. *See generally White v. Mclain*, No. 15-15270, __ F. App'x __, 2016 WL 1566639, at *3 (11th Cir. Apr. 19, 2016) ("None of our precedents

---

[10] *See Mesa v. United States*, 123 F.3d 1435, 1438 (11th Cir. 1997) ("[I]n deciding how extensively to investigate the location and identity of the subject, agents may weigh the urgency of apprehending the subject in light of such factors as the potential threat the subject poses to public safety and the likelihood that the subject may destroy evidence.").

16

holds—or logically compels the conclusion—that an officer's well-intentioned attempts to ascertain and identify the property described in a warrant are not reasonable simply because they lead to an error, or because more accurate means of ascertaining the property's identity were available."); *Cf. Hartsfield*, 50 F.3d at 955 ("Given the *per se* rule against warrantless searches and the guidance of the *Garrison* court's description of reasonable police efforts, all reasonable police officers should have known that Newton's acts-searching the wrong residence when he had done nothing to make sure he was searching the house described in the warrant-violated the law."). Thus, even if Walker and Surf acted unreasonably in executing the warrants, they are entitled to qualified immunity on the warrantless search claims.

### 2. Excessive force

Having found that the warrantless search claims cannot survive summary judgment, the Court turns to the claims based on excessive force.

#### a. Constitutional violation

"To succeed on an excessive-force claim under the Fourth Amendment, plaintiffs must demonstrate (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and that (3) the force used was objectively unreasonable." *Brothers v. Zoss*, No. 15-51204, __ F.3d __, 2016 WL 4896053, at *3 (5th Cir. Sep. 14, 2016) (internal quotation marks omitted). Here, Surf and Walker argue that the excessive force claims must fail because the Robinsons suffered no injury. Doc. #26 at 17. The Robinsons did not respond to this argument, and Surf and Walker contend that this failure operates as a concession of this argument. Doc. #41 at 6.

Generally, where a plaintiff has failed to respond to summary judgment arguments against particular claims, such claims are deemed waived. *See Muniz v. El Paso Marriott*, 773

F.Supp.2d 674, 683–84 (W.D. Tex. 2011) (collecting cases). Accordingly, the Robinsons' failure to respond to Walker and Surf's arguments regarding the excessive force claims operates as a waiver of such claims. *Id*. But, even if the claims were not waived, they would still fail.

To satisfy the first prong of an excessive force claim, an "injury must be more than *de minimis*." *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). Under this standard, allegations of emotional distress without supporting medical evidence cannot survive a motion for summary judgment. *Brooks v. City of West Point*, 639 F. App'x 986, 990 (5th Cir. 2016).

In this case, the Robinsons aver that, as a result of the search, they suffered anxiety and lack of sleep. Doc. #38-8 at ¶ 20. Furthermore, Milton avers that the incident re-triggered his post-traumatic stress disorder. *Id.* However, the Robinsons have not submitted any medical evidence in support of these allegations. Accordingly, the excessive force claims must fail. *See Brooks*, 639 F. App'x at 990 ("Brooks's additional allegation that he suffered an increase in his PTSD symptoms, which he does not support with medical evidence, does not suffice to survive summary judgment.").

### b. *Clearly established*

Having found no constitutional violation as to the excessive force claim, there is no need to consider the second prong of the qualified immunity analysis.

### B. Release of Claims

Finally, having found that Surf and Walker are entitled to qualified immunity on all claims, the Court declines to consider the scope and validity of the release signed by the Robinsons.

## VI
## Conclusion

For the reasons above, it is **ORDERED**:

1. The motion to dismiss filed by Morris [29] is **DENIED as moot** due to the Court's prior dismissal of Morris.

2. The motion to substitute [37] filed by Smith, Surf and Walker is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent it seeks relief on the part of Surf and Walker and DENIED as moot as to Smith due to the Court's prior dismissal of Smith.

3. The motion to dismiss filed by Smith, Surf, and Walker, which this Court converted to a motion for summary judgment [25], is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent it seeks dismissal of all claims against Surf and Walker and DENIED as moot as to Smith due to the Court's prior dismissal of Smith.

**SO ORDERED**, this 22nd day of September, 2016.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**